**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ESTER BEST MITCHELL,     :
Individually and as next best friend of :
Cleveland McKinney, Jr.    :
           :
   Plaintiff,     :
           :
   v.       : Case No.:  1:06-CV-00491
           : Judge:  Rosemary M. Collyer
BANNUM, INC.,     :
           :
   Defendant.    :

**MOTION FOR SUMMARY JUDGMENT AND/OR
MOTION TO DISMISS
BY DEFENDANT BANNUM, INC.**

   Defendant, Bannum, Inc. ("Bannum" or "Defendant"), by and through counsel, CARR

MALONEY P.C., pursuant to Federal Rules of Civil Procedure 12 and/or 56, hereby moves for

summary judgment and/or to dismiss the Complaint.[1]  As grounds therefor, Defendant refers this

Court to the attached Memorandum of Points and Authorities, and Statement of Material Facts,

incorporated herein by reference.

           Respectfully submitted,

           CARR MALONEY P.C.

     By:
         /s/ Kevin M. Murphy
         Kevin M. Murphy, D.C. Bar #388476
         Cedric D. Miller, D.C. Bar #464651
         1615 L Street, N.W.
         Suite 500
         Washington, D.C.  20036
         (202) 310-5500 (Telephone)
         (202) 310-5555 (Facsimile)

---

[1] FRCP 12 permits the Court to rule on the Motion as either a Motion to Dismiss or for Summary Judgment, depending upon whether the Court relies upon matters outside the pleadings.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing ***Motion for Summary Judgment and/or Motion to Dismiss*** was filed and served, electronically, on this 4th day of April, 2007, to:

Gregory L. Lattimer, Esquire
1100 H Street, N.W.
Suite 920
Washington, D.C.  20005

Donald M. Temple, Esquire
1229 15th Street, N.W.
Washington, D.C.  20005

/s/ Kevin M. Murphy_____
Kevin M. Murphy

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTER BEST MITCHELL, | : | |
| Individually and as next best friend of | : | |
| Cleveland McKinney, Jr. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 1:06-CV-00491 |
| | : | Judge: Rosemary M. Collyer |
| BANNUM, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT BANNUM, INC.'S MOTION FOR SUMMARY JUDGMENT**
**AND/OR MOTION TO DISMISS**

Defendant, Bannum, Inc., by and through counsel, CARR MALONEY P.C., in support of

its Motion, respectfully submits the following Memorandum of Points and Authorities.

**I.      Introduction**

      **A.      Summary of Claims and Defenses.**

This cause of action arises out of the shooting death of Mr. Cleveland McKinney, Jr.

("Mr. McKinney, Jr."), which is alleged to have taken place on June 29, 2005, inside Bannum

Place of Washington ("Bannum Place"), a Community Corrections Center (CCC), sometimes

referred to generically as a "half-way house." The CCC was operated not by Bannum, Inc., but

rather by Bannum Place of Washington, D.C., Inc., a District of Columbia Corporation. Bannum

Place of Washington D.C., Inc. was operating that facility pursuant to a May 7, 2003 Assignment

(See Exhibit A) of the contract between Bannum, Inc. and the United States Department of

Justice, Federal Bureau of Prisons ("BOP"). *See* Complaint. Decedent Mr. McKinney, Jr. was a

federal offender who had been referred by BOP to the Bannum Place facility as of May 4, 2005. *See* Exhibit M.

Plaintiff is the mother of the decedent. She alleges that while Mr. McKinney, Jr. was a resident of Bannum Place, he was shot and killed by an unidentified gunman. Complaint at ¶ 28. Although it is not clearly or directly alleged, presumably Plaintiff asserts that the unknown gunman was able to gain entry to the facility because "Bannum failed to have properly trained and/or supervised staff on duty and because there were no security measures in place with respect to entering and leaving the facility." Complaint at ¶ 18. Plaintiff's Complaint alleges that "[p]rior to the alleged shooting death of plaintiff's decedent, Bannum knew that its staff was poorly trained and barely supervised; knew that there was no security in place with respect to entry and exit from the facility; and knew that there was little or no attention paid to the scrutiny of contraband coming into the facility." Complaint at ¶ 19. According to Plaintiff, "Bannum's absence of security over this facility constituted gross negligence." Complaint at ¶ 20.

When asked in Interrogatories to state the facts in support of her claims, Plaintiff merely referenced and restated the same vague conclusory allegations that are in her Complaint. *See* Plaintiff's Answers to Interrogatories, attached as Exhibit B, especially Answer Nos. 15, 17, 18, 24 and 25. Essentially, Plaintiff's Answers state that Mr. McKinney was shot by an armed gunman, whose identity is unknown. It is <u>not</u> asserted that the assailant was an employee or agent of Defendant.

Plaintiff's Complaint alleges five counts against Bannum: (1) a claim under the District of Columbia's Wrongful Death Act; (2) a claim under the District of Columbia Survival Act; (3) deprivation of civil rights; Eighth Amendment, 42 U.S.C. § 1983; (4) negligent supervision; and (5) negligent infliction of emotional distress. *See generally* Complaint. Bannum asserts in

defense and in this motion that Plaintiff cannot maintain her claims against Bannum for numerous reasons. Defenses included in this Motion are briefly summarized below, and are more particularly addressed in the Argument section, *infra*.

First, Defendant Bannum, Inc. asserts that, due to the fact that it assigned its contract to Bannum Place of Washington D.C., Inc., which was the entity actually operating the facility on the date of the incident, and because Bannum, Inc. had no direct relationship with Plaintiff's decedent, Bannum, Inc. is the wrong party (as pointed out to Plaintiff in the Answer to the Complaint) and cannot be liable.

Second, Mr. McKinney, Jr. signed a legally enforceable waiver of liability on May 5, 2005, which states in part, " . . . I understand the nature of the program and the type of resident referred . . . and accepted into the program, and I agree to hold harmless the contractor, its management and center staff in connection with any harmful acts occurring to me during my residency . . . which result from inappropriate action upon me . . . ." *See* Exhibit L, Hold Harmless Agreement.

Third, as a government contractor, Bannum, Inc. is not liable under the "government contractor" defense, as it is entitled to the same immunity conferred upon the government in carrying out the specific contract provisions.

Each of the above three arguments are set out first in the Argument section, as each of them apply to all of the five counts of the Complaint. The following defenses apply to some, but less than all counts.

Bannum asserts in defense and in this motion that it is not liable on the negligence-based counts (negligent supervision, negligent infliction of emotional distress, Wrongful Death Act, and Survival Act claims), as a matter of law. Plaintiff's negligent supervision claim essentially

3

alleges that "defendant acted negligently, carelessly and recklessly by failing to properly supervise the personnel at Bannum Place and by failing to properly train, supervise, control, direct and monitor their agents in their respective duties and responsibilities. Complaint at ¶ 33, 34. Plaintiff's negligent infliction of emotional distress claim essentially alleges that unauthorized persons with "contraband", a/k/a weapons, were allowed entry to Bannum Place. Complaint at ¶ 36-37. Again, Bannum, Inc. was not the operator of the facility, but beyond that, Plaintiff cannot demonstrate that Bannum took on a heightened duty to protect Mr. McKinney, Jr. from a criminal act of an unknown third party. Bannum's role was established by contract as a limited one which did not include heightened security against criminal acts by third parties. Therefore, the "general rule of non-liability" applied by courts in the District of Columbia to such claims should apply.

Furthermore, District of Columbia courts have routinely held that expert testimony is required to establish the standard of care in negligence cases which involve issues of safety, security and crime prevention. *See, e.g.*, *Clark v. District of Columbia*, 708 A.2d 632, 634-35 (D.C. 1997); *see also District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995). Similarly, it appears likely that expert testimony is also required under District of Columbia law to establish heightened foreseeability with respect to the liability of a defendant for the criminal acts of a third-party. *See, e.g., Bailey v. District of Columbia*, 668 A.2d 817, 822 (D.C. 1995); *District of Columbia v. Doe,* 524 A.2d 30 (D.C. 1987). Because Plaintiff has failed to designate an expert to offer opinion testimony regarding standard of care as well as heightened foreseeability issues, she cannot meet her burden of proof. As a result, her negligence-based claims should be dismissed.

In addition, regarding her negligence-based claims, Plaintiff has not alleged and cannot demonstrate that any act or omission of Bannum was the *proximate cause* of the shooting by an unknown, armed intruder.  Rather, Plaintiff essentially alleges that Mr. McKinney, Jr. was shot inside Bannum Place, and that Bannum Place had inadequate security, but Plaintiff does not allege nor state in Answers to Interrogatories any connection between the two basic allegations. The alleged lack of training and/or supervision of Bannum Place employees was not the proximate cause of Plaintiff's injuries, particularly in light of the fact that Bannum's contract with BOP expressly forbade employees from carrying weapons of any type, arresting, detaining, and/or otherwise restraining any Bannum Place resident.  Bannum Place personnel had no greater ability to stop an intruding gunman than any other private citizen.  As a CCC, Bannum Place was not a prison type of facility; it was not required to have bars, guards, and other prison-type security; and in fact the offenders at this CCC were allowed to, and in fact, encouraged to (by the nature of the contract) come and go from the facility to employment, activities, family visits, etc.  The offenders in this program were in their final months of their terms of incarceration, and a CCC like Bannum Place was a place of transition back into the community, not a prison.

In Count III, Plaintiff attempts to assert a private cause of action for damages under 42 U.S.C. § 1983 for an alleged violation of the Eighth Amendment's right to be free of cruel and unusual punishment.  Plaintiff alleges that "defendant, acting under color of law and with deliberate indifference to and reckless disregard for the safety and well being of the residents/inmates transferred to Bannum Place … allow[ed] to be committed acts which deprived Cleveland McKinney, Jr. of his constitutional rights against cruel and unusual punishment." Complaint at ¶ 27.  Plaintiff's decedent was a federal offender, and Bannum, Inc.'s contract was

with the federal BOP, not a state or municipality.  Thus, 42 U.S.C. § 1983 is inapplicable since it applies only to persons acting under color of *state* law.  *See Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001).  Moreover, there is no implied private right of action, pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for damages against private entities that engage in alleged constitutional deprivations while acting under color of federal law. *Id.*    As such, Plaintiff cannot sue under Section 1983, nor can she bring a *Bivens* private action for damages against a private entity like Bannum, Inc.

If the Court agrees that Bannum, Inc. is not the proper party by virtue of its assignment of its contract with BOP, or that the claims are barred by Mr. McKinney, Jr.'s voluntary waiver of liability, or that the "government contractor" defense applies, then all the claims end there.  If the Court does not agree with those arguments, then it is asked to examine the nature of the allegations and the lack of proof to support those allegations, as a matter of law.  The critical facts against which Plaintiff's claims must be measured are the terms of Bannum's contract with BOP.  These terms are summarized in the final contract award, which by reference incorporates BOP's Requests for Proposals ("RFP"), Bannum's responses thereto, and the Statement of Work (*see* Exhibits D and E, respectively).[2]  The contract terms clearly undercut Plaintiff's claims.

### B.    Summary of Bannum's Role Under the BOP Contract

Pursuant to a BOP Award of Contract dated November 16, 2001, Bannum, Inc. was chosen to operate a halfway house in the District of Columbia, which would be known as Bannum Place.  *See* Exhibit C.  The terms of said contract gave specific direction and placed numerous restrictions on Bannum Place and its employees regarding the services it was required

---

[2] Exhibit D is a CD Rom that encompasses the full contract between Bannum, Inc. and BOP, including all correspondence regarding modifications to the RFP.  As appropriate, redactions have been made to those contract documents to conform to the parties' stipulated protective order.

to provide to its eventual residents, including Plaintiff's decedent, Mr. McKinney, Jr.  *See* Statement of Work, attached hereto as Exhibit E.  Because Bannum Place was not viewed as a traditional prison facility or correctional institution, the security provisions applicable to those institutions were not required by the Bannum Place contract documents.  *See* Exhibit E; s*ee also* letters from Bannum, Inc. to the Mayor of the District of Columbia, the Police Chief of the District of Columbia, and the Honorable Vincent Orange, Councilman, Ward 5, attached hereto respectively as Exhibits F, G and H, informing of BOP's RFPs to operate the facility, and the parameters of the duties and responsibilities of Bannum, Inc.  Bannum Place, as conceived, was a residential transitory facility that provided housing and other support services to offenders while they worked toward their full and complete reintegration into society.  *See, e.g.,* Exhibit F.

The role of Bannum Place in relation to the offenders was particularly defined as providing housing, and assisting residents in their quest of re-establishing employment and family ties, locating suitable housing, and preparing them to function normally within the community to which they were returning.  *Id*; *see also* Exhibit E at 3.  Bannum Place simply did not contract with BOP to provide the kind of heightened security provided in prisons or lock-down correctional facilities.  In fact, Bannum Place, as requested by BOP, was not a lockdown facility; it had no bars, no locks, no gates, no security fence, and no other physical restraints of any kind, as none of these items were contemplated or required by BOP.  *See, e.g.,* Exhibit E at 25, setting forth all applicable code provisions relating to BOP's contract with Bannum, Inc.  In fact, residents of Bannum Place were required to enter and exit the facility on a daily basis as all were expected to be gainfully employed in a forty-hour per week capacity (outside the facility) as a condition of residing at the facility.  *See, e.g.,* Exhibits E and F.  Furthermore, Bannum Place's staff members were not peace officers.  *See* Exhibit F.  They were not allowed to carry

weapons of any type, including pepper spray, or other self-defense type of chemical agents, while working in the facility or when on duty. *Id*. Additionally, Bannum Place employees were strictly forbidden from physically restraining or detaining any resident unless it was for the immediate self-defense of the employee. *See* Exhibit D. If restraint and/or detention, or the like was required, they were instructed to call 911. *Id*. Finally, Bannum Place employees did not wear uniforms, and they did not possess any other form of identification or powers in addition to those of any other ordinary U.S. citizen. *See* Exhibit F. Bannum Place employees, by the terms of the contract, served primarily in the role of social workers, and were certainly not guards.

The fact of the matter is, pursuant to its contract with BOP, in terms of "security," Bannum Place was simply responsible for compliance with codes such as building codes and OSHA regulations, and resident "accountability." *See* Exhibit E, at 25, 47-50. In this regard, Bannum Place was required to be able to account daily for each resident's whereabouts. In fulfilling this responsibility, Bannum Place required and maintained resident sign-in and out logs, there were also head-counts during specific times of the day and night, random site visits and calls were made to residents' places of employment, as well as to the homes of their families and friends. *See* Exhibit E. Additionally, there were curfews in place for all residents during the week as well, and curfews on Sunday night for residents returning to the facility after spending the weekend with families and friends. *Id*. There were no further "security" provisions pursuant to the contract with BOP.[3]

---

[3] With regard to contraband, the SOW states only that Bannum Place shall perform pat-down searches of residents and their belongings at least once a month, not daily or even weekly. The text of the SOW clearly shows that the primary reason for such requirement was to periodically check for narcotics at the facility. If a weapon was discovered, employees were to simply call law enforcement. *See* Exhibit E, at 50.

## II.    Legal Standard for Summary Judgment or Dismissal

Pursuant to Federal Rule of Civil Procedure 12(b)(6), where a complaint fails to state a claim upon which relief can be granted, the complaint shall be dismissed.  *See, e.g.*, *Daskalea v. The Washington Humane Society*, 2007 WL 751503 (D.D.C. 2007).

Under Federal Rule of Civil Procedure 56(c), a court may properly grant summary judgment when, considering the pleadings and discovery on file in the case, it clearly appears "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c).  A moving party is entitled to summary judgment where the nonmoving party has failed to meet her burden of producing facts that support the essential elements of her case, and any factual assertions contained in affidavits and other evidence in support of the moving party's motion shall be accepted as true unless the facts are controverted by the nonmoving party through affidavits or other documentary evidence.  *See Williams v. U.S.*, 932 F. Supp. 354 (D.D.C. 1996).  If the court is to deny summary judgment, there must be evidence on which a jury could reasonably find for the nonmoving party.  *See Rumore v. Belk*, 907 F. Supp. 487 (D.D.C. 1995).

Fed. R. Civ. P. 56 states as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, ***must set forth specific facts*** showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e) (emphasis added).  It is Plaintiff's burden at this stage to produce facts sufficient to create a jury question as to each element of this claim.

### III.    Argument

#### A.    Plaintiff's Failure to Name the Proper Party in this Lawsuit Must Result in Dismissal of Her Claims.

On November 16, 2001, Bannum, Inc. entered into a contract with BOP to provide residential CCC services for the Washington, D.C. area.  *See* Exhibit C.  On May 7, 2003, however, Bannum, Inc. assigned its contract with BOP to Bannum Place of Washington, D.C., Inc. (this assignment was made the same day Bannum Place of Washington, D.C., Inc. was formed).  *See* Exhibit A.  Pursuant to the terms of the assignment, Bannum, Inc. maintained no further interest or obligation for the performance of the contract with BOP.  *See* Exhibit A. Furthermore, Bannum Place assumed and agreed to perform all of Bannum, Inc.'s duties under the contract, and also agreed to indemnify and hold harmless Bannum, Inc. from any claim or demand made relating to the BOP contract.  *See* Exhibit A.  The "Recitals" section of the assignment Agreement clearly sets forth the rationale for Bannum, Inc.'s decision to assign the contract with BOP to Bannum Place.  *See* Exhibit A.  Specifically, that portion of the Agreement reflects Bannum, Inc.'s concerns about the political and legal opposition it received from political leaders and community organizations regarding the location and operation of CCCs within the District of Columbia.  *See* "Recitals" to Exhibit A.  Bannum, Inc. believed that because of all the political and social turmoil surrounding its location and operation in the District of Columbia that it needed to insulate itself from the possibility of tarnishing its excellent performance reputation with BOP – a reputation it has maintained for over two decades.  *See* "Recitals," Exhibit A.  As a result, on May 7, 2003, Bannum Place of Washington, D.C., Inc. was created for the purpose of protecting Bannum, Inc.'s property interests and its reputation and good will.  *See* Exhibits A and K.

Bannum Place opened its doors on or about May 2003 (the same month and year of the assignment). After the Assignment, Bannum, Inc. allowed its corporate status in Washington, D.C. to lapse, further proof that it no longer was responsible for Bannum Place. Bannum Place of Washington, D.C., Inc. has maintained its corporate status within the District of Columbia from its inception until Bannum Place closed, and had full and exclusive control over the operation of Bannum Place. *See* Exhibit K.

Plaintiff has elected to continue this lawsuit against Bannum, Inc. as opposed to Bannum Place of Washington, D.C., even though Bannum, Inc. explained the Assignment issue in its Answer to the Complaint. On June 29, 2005, the date of the alleged shooting of Mr. McKinney, Jr., Bannum, Inc. no longer maintained an interest in the Award of Contract it previously entered with BOP. Bannum, Inc. had two years earlier assigned such Award of Contract to Bannum Place of Washington, D.C. Bannum, Inc. maintains that it had no interest in Bannum Place of Washington, D.C. at the time of the alleged shooting death of Mr. McKinney, Jr.; that said interest in Bannum Place had been assigned to Bannum Place over two years before the alleged shooting death; and that Plaintiff has failed to sue the proper party in this litigation. Therefore, summary judgment for Defendant on all claims is proper.

**B.     Plaintiff Cannot Go Forward on Any of Her Claims Because Mr. McKinney, Jr. Signed a Legally Enforceable Waiver of Liability.**

On May 5, 2005, Mr. McKinney, Jr. signed a Hold Harmless Agreement ("Agreement") with Bannum Place, which states in part, " . . . I understand the nature of the program and the type of resident referred . . . and accepted into the program, and I agree to hold harmless the contractor, its management and center staff in connection with any harmful acts occurring to me during my residency . . . which result from inappropriate action upon me . . . ." *See* Exhibit L.

Although there is little case law that addresses it specifically, the District of Columbia is willing to recognize prospective liability waivers for claims of negligent conduct resulting in personal injury. *Wright v. Sony Pictures Entertainment* 394 F. Supp.2d 27 (D.D.C. 2005). Specifically, District of Columbia law requires that the language of the waiver be clear and unambiguous. *Maiatico v. Hot Shoppes, Inc.*, 287 F.2d 349, 351-352 (D.C. Cir. 1961). Furthermore, "no particular form or words are needed but the intent to waive negligence must be clear." *Id*. In *Wright v. Sony Pictures Entertainment*, the court held valid a prospective liability waiver that was eight pages in length and single spaced. 394 F. Supp.2d 27, 34 (D.D.C. 2005). The paragraph, number 31 of the agreement, containing the waiver language was in all capital letters and " . . . clear so that plaintiff would understand he was waiving his right to bring a claim for personal injuries . . . ." *Id*. It stated, "I agree that I will not bring or be a party to any legal action or claim against the released parties, based upon or arising out of my participation on the program or in any way related to the program, or any exploitation of the program, on any legal theory." *Id*. at 30.

Here, Mr. McKinney, Jr. signed a half-page, one-paragraph agreement entitled "HOLD HARMLESS AGREEMENT" in all capital, bold letters at the top of the page. Although the specific language of the paragraph, as cited above, was not set aside in capital letters as it was in *Wright*, Mr. McKinney, Jr. did not have to read eight pages of single spaced text, but rather he had to read one paragraph. Furthermore, the language of the waiver is clear and unambiguous so that Mr. McKinney, Jr. would understand that he was agreeing to not hold Bannum liable for any harmful acts by third parties.

In addition, there is nothing within the Agreement or the surrounding facts to suggest that Mr. McKinney, Jr. did not voluntarily and knowingly enter the Program. In fact, Bannum is not

a mandatory program at all.  *See* Exhibit I, Affidavit of David Lowry.  Inmates have the choice to enter the Bannum Place Program once they are accepted.  *Id*.  It has occurred that inmates choose not to enter the Program, but rather finish the remainder of their sentences in prison.  *Id*.  Mr. McKinney, Jr. had the same choice as these other inmates, but upon reading the Agreement, he chose to accept the risk, enter the Program and reside at Bannum Place.

Finally, given the nature of the program and the type of resident referred to and accepted into the program (a program for criminals who have committed dangerous crimes and associate with dangerous individuals), a release of this sort is crucial.  Absent such a release, Bannum (and programs like it) would open itself up to frequent claims for the criminal acts of third parties which would very likely impair the continued viability of this type of transition facility for offenders.  By upholding waivers of this sort, "risk-tolerant individuals may stand to gain from being permitted to trade away their entitlement to non-negligent treatment."  *Jaffe v. Pallotta Team Works*, 374 F.3d 1223 (D.C. Cir. 2004).

**C.    The "Government Contractor" Defense Makes Bannum Immune from Suit.**

The Supreme Court has long recognized that a government contractor is generally entitled to the same immunity from suit as the government has, for acts by the contractor pursuant to the contract.  See *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988); *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940).  There are two exceptions: (a) where an agent has exceeded the scope of authority conferred by the government, or (b) where that authority has not been validly conferred by the government.  Neither exception applies here, and Plaintiff has not alleged either.  As such, Bannum is entitled to immunity from suit.

In a lawsuit against a CCC just like Bannum Place, Judge Preska of the Southern District of New York recently applied the government contractor defense to bar a claim by a resident

offender against the company.  *Norwood v. Esmor*, 1997 WL 65913 (S.D.N.Y. 1997); *but c.f. Scainetti v United States*, 2002 WL 31844920 (S.D.N.Y. 2002).

The BOP has exclusive authority and control over CCCs, including which offenders are to be assigned to which CCCs, the designation of health and habitability standards, and the monitoring of same.  *18 U.S.C. § 3621*; *Dismas Charities, Inc. v. U.S. Dept. of Justice, Federal Bureau of Prisons*, 287 F. Supp.2d 741 (W.D. Ky. 2003). The contract here, with all of its referenced parts, is extensive and precise in the manner that Bannum Place was to be operated. Yet, there is no directive within the extensive contract documents that Bannum Place take any unusual or extraordinary steps for security against intruders.  As such, Bannum Place cannot be held liable when it did not breach any requirement of its contract which was prepared by the BOP.  The BOP would have immunity for such a lawsuit if it were the operator of the facility. The same immunity flows to the contractor.

**D.    Plaintiff Has Failed to Establish Her Negligence-based Claims.**

Should the court decide that none of Bannum's previously discussed defenses apply, Plaintiff must then prove on her negligence-based claims that Defendant owed Plaintiff a duty, breached that duty, and that such breach was the proximate cause of the damages alleged by Plaintiff.  *District of Columbia v. Price*, 759 A.2d 181 (2000); *Jarrett v. Woodward Bros., Inc.*, 751 A.2d 972 (2000). The negligence-based claims are those in Count I (Survival Act), Count II (Wrongful Death), Count IV (Negligent Supervision), and Count V (Negligent Infliction of Emotional Distress).

**i.    Bannum Owed No Duty To Plaintiff's Decedent To Secure The Facility Beyond What Was Required By Its Contract With BOP**

As previously illustrated, Bannum, Inc. was not the operator of the Bannum Place facility.  Hence, Plaintiff has sued the wrong party.  Nevertheless, should the Court determine that Plaintiff can maintain her claims against Bannum, such claims, nonetheless, necessarily fail.

In her Complaint, Plaintiff alleges that Defendant owed a duty of care to the residents transferred to Bannum Place regarding their personal security; that Bannum Place breached their duty of care by failing to provide adequate security measures; and that Plaintiff's decedent suffered the injuries that now form the basis of her Complaint.  The essential flaw in Plaintiff's claims is that she fails to acknowledge that under the BOP contract, and under District of Columbia law, there was no duty to provide elevated or heightened security.

Plaintiff's indirect allegations in the Complaint that Bannum had a duty to provide a facility that an armed intruder could not possibly enter, is directly contradicted by the limited offender accountability role taken on by Bannum in the contract with BOP.  Plaintiff's non-specific contention that "there was no security in place with respect to entry and exit from the facility" demonstrates a fundamentally flawed assumption.  As previously described, Bannum did not contract to provide a lock-down facility with guards.  Its role, by contract, was to have a sign-in and sign-out sheet, to use measures to try to control the introduction of narcotics, and to periodically check on the whereabouts of offenders.  Bannum did not contract to provide an intruder-proof, secure facility.  This was not a prison where inmates could not come and go, and outsiders could not enter without permission.  This was a CCC or half-way house, akin to many residential facilities in many communities.  Further, while Plaintiff alleges that "little" or no attention was paid to the scrutiny of "contraband" coming into the facility, Plaintiff's argument is misplaced because (a) the BOP contract referred to "contraband" only in the nature of illegal

15

drugs, and (b) Bannum Place did have a policy with regard to prohibiting narcotic contraband from entering the facility, and (c) that "contraband" policy has no relationship to the alleged shooting incident. Offenders were by design coming and going daily, and although occasional (only required to be conducted once monthly) pat-downs and limited searches were a part of this contract, the primary concern of such searches related only to illicit drug confiscation. *See* Exhibit E, at 50. Pursuant to BOP's contract, there was no way for employees, personally, to stop the introduction of weapons and the like, from being brought into the facility absent police involvement. Furthermore, Bannum Place employees were only authorized to search residents, not visitors or other third parties. Id. Therefore, because Plaintiff acknowledges that the gunman was unknown, and does not allege that he/she was a resident of the facility, it is clear that these employees lacked the authority or power to conduct a search of the alleged gunman, who Plaintiff presumes was an intruder.

In summary, Plaintiff asserts a "duty" of heightened security against armed intruders that did not exist under the BOP contract.

### ii.    Under District of Columbia law, Bannum Does Not Owe a Duty to Prevent a Criminal Act of a Third Party.

### a.    General Rule of Non-Liability Applies

The District of Columbia has adopted a "general rule of _non_liability" with regard to harm caused by the criminal acts of another. *Workman v. United Methodist Committee on Relief of the General Board of Global Ministries of the United Methodist Church*, 320 F.3d 259; 2003 U.S. App. Lexis 3457*; Potts v. District of Columbia,* 697 A.2d 1249, 1252 (D.C. 1997). The rule is one from which the courts in the District of Columbia seldom and reluctantly depart.[4] Only in

---

[4] *See Workman,* 320 F.3d 259; (holding that Plaintiff, the mother of a woman shot and killed while providing relief work in Somalia, failed to meet the "heightened foreseeability" standard where the relationship between the parties, employee/employer, did not suggest that the employer should have been responsible for the employee's safety, and

instances where the alleged crime was <u>particularly</u> foreseeable will the District consider departing from the rule to determine whether a Defendant may be liable for harm caused by the criminal act of a third party.  *Workman,* 320 F.3d at 262.  Even under this limited exception, however, such foreseeability is not established by a simple showing, but must be established by a *heightened* showing - more than would be required if the act were merely negligent.  Moreover, the heightened showing requirement is a demanding one, and the proof must be precise because of the extraordinary nature of criminal conduct.  *See, e.g., McKethean v. Washington Metro. Area Transit Auth*., 588 A.2d 708, 717 (D.C. 1991).

Furthermore, foreseeability cannot be predicated upon generic information such as crime rates, or evidence that the defendant's employees worked in a criminally active environment. *See Bailey v. District of Columbia*, 668 A.2d 817, 822 (D.C. 1995); *Clement v. Peoples Drug Store, Inc*., 634 A.2d 425, 429 (D.C. 1993).  What is more, an "urban crime problem…does not put any additional duty on [defendants] to insure the safety of [patrons] against all harm." *Ellis v. Safeway Stores, Inc.*, 410 A.2d 1381 (D.C. 1979).

In fact, only in a few reported cases have courts in the District of Columbia found evidence to satisfy the stringent showing of heightened foreseeability.[5]  In such cases, the District

---

plaintiff's evidence of foreseeability fell short of the heightened standard, although there was evidence that Somalia was dangerous.); *McKethean v. Washington Metropolitan Area Transit Authority*, 588 A.2d 708, 717 (D.C. 1991) (evidence regarding rate of collisions at bus stops and high frequency of traffic accidents involving alcohol and drug abuse insufficient); *Bailey v. District of Columbia,* 668 A.2d at 820 (D.C. 1995) (finding insufficient the affidavits of witnesses who asserted that the area around the school was a 'high drug area' and that shootings occurred in that neighborhood.  "Although the occurrence of shootings in, and in the vicinity of, the District's public schools is an unhappy reality, such 'generic information,' by itself, does not create a duty on the part of the District to protect against the use of firearms under the circumstances presented here."); *Potts*, 697 A.2d at 1252 (summary judgment warranted in light of plaintiff's failure to provide evidence of any prior gun-related violence at similar events, "nor any other specific evidence bearing directly on the foreseeability of the shooting incident at issue.")

[5]  *Doe v. Dominion Bank of Washington*, 295 U.S. App. D.C. 385, 963 F.2d 1552, 1559 (1992) (imposing a duty of protection where tenant was raped because landlord was previously notified about threatening intruders, thefts, drug use and sexual activity in the building and where the landlord "was in the better position both to know about security threats and to protect against them."; *District of Columbia v. Doe,* 524 A.2d 30 (D.C. 1987) (holding evidence sufficient where "school officials were on notice of the danger to students from assaultive criminal conduct of others by intruders" and where the duty of protection involved the custodial care for schoolchildren); *See, e.g.,Clement,* 634 A.2d at 429 ("Implicit in *Doe's* holding was the notion that particular care is required by school officials when the safety of young children is involved").

departed from the "nonliability rule" <u>only</u> in instances where (a) the evidence revealed that defendant was on notice that there was a specifically known and substantial risk of harm to the plaintiff, and (b) where the relationship between the plaintiff and the defendant was such that the defendant should be held liable as a matter of policy.[6]  *Workman,* 320 F.3d at 263.  In fact, a review of the cases in the District of Columbia reveals that "the requirement that the defendant have been able to foresee that a third party would likely commit a criminal act ordinarily has, and perhaps must have, a relational component," such as a student-teacher or landlord-tenant relationship.  *Workman,* 320 F.3d at 263.

As such, because of the District's strict heightened foreseeability standard and required relational component, courts applying District of Columbia law regularly grant a Defendant's motion for summary judgment on the ground that Plaintiff's evidence is insufficient to establish that a criminal act was reasonably foreseeable.  *Workman*, 320 F.3d at 262.

Plaintiff in this case, has not even alleged, and has offered no proof, that the criminal act of an unknown gunman at Bannum Place was foreseeable, let alone <u>so</u> particularly foreseeable, that a duty arose to guard specifically against it.  Furthermore, Plaintiff's Complaint is devoid of any allegations tending to suggest that Bannum was on notice that there was a specifically known and substantial risk of harm to Plaintiff.  Therefore, based upon the foregoing, Plaintiff has unquestionably failed to establish the first prong under the *Workman* test.

Given the limitations by contract on Bannum's role and the relatively flexible and community based nature of a halfway house, Plaintiff also cannot establish the second part of the *Workman* test, i.e., such a special relationship existed that the usually stringent and specific level

---

[6] The cases in the District of Columbia suggest a scale: "[i]f the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not of a type that entails a duty of protection, then the evidentiary hurdle is higher." *Id* at 264.

of required foreseeability is lessened.  As explained at length in preceding sections, the contract between Bannum and BOP simply did <u>not</u> require the kind of stringent security alleged by Plaintiff.  As such, Plaintiff cannot demonstrate the type of special relationship, for example, school/student, that is only rarely found by District of Columbia courts to lower the "heightened foreseeability standard" normally required in the District of Columbia.

Therefore, reasonable minds could not conclude that it was particularly or specifically foreseeable that an armed gunman would enter the facility and shoot and kill Mr. McKinney, Jr., nor could reasonable minds conclude that Bannum took on the type of duty of security for the offenders that would be required to establish a "special relationship" as applied in *Workman* and other District of Columbia case law for a case involving a criminal act of a third party.

### b.  Plaintiff's Failure to Offer Expert Testimony Regarding Issues of Standard of Care and Heightened Foreseeability Should Result in Dismissal of her Negligence-Based Claims.

Plaintiff claims that "defendants (sic) owed a duty of care to the residents/inmates transferred to Bannum Place . . . relative to their personal security and . . . defendant breached their duty of care by failing to monitor and supervise their staff's activities and . . . [a]s a direct and proximate result of defendants' (sic) negligent supervision of personnel at Bannum Place (sic) was viciously murdered within the confines of Bannum Place." *See* Complaint at 31-33.

Plaintiff, however, has failed to designate an expert to offer opinion testimony to support her claim.  Therefore, any reference and/or evidence regarding this allegation must be excluded and plaintiff's claim must be dismissed.  Plaintiff, to prove her case under District of Columbia law, <u>must</u> proffer expert testimony regarding the standard of care required for issues involving safety and security as alleged in her Complaint, and she has failed to do so.  As previously illustrated, District of Columbia courts have routinely held that expert testimony is required to

establish the standard of care in negligence cases which involve issues of safety, security and crime prevention. *Clark v. District of Columbia*, 708 A.2d 632, 634-5 (D.C. 1997); *District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995). "Especially in circumstances in which, as in this case, the defendant is alleged to have failed to protect the plaintiff from harm, the expert must 'clearly articulate and reference a standard of care by which the defendant's actions can be measured." *Varner v. District of Columbia*, 891 A.2d 260, 269 (D.C. 2006) (citing *Clark*, 708 A.2d at 635.) Plaintiff's allegations fit squarely within D.C.'s requirement for expert testimony. As such, without expert testimony, Plaintiff cannot prove the first and most essential element of her negligence claims regarding security and safety against Bannum. *Id*. Plaintiff has failed to proffer <u>any</u> expert testimony as required by D.C. law. She has failed to articulate any standard of care to which Defendant is held, let alone any deviation from that standard.

It is well established the under the law of the District of Columbia, if the applicable standard of care in a negligence action is "beyond the ken of the average layperson," then the Plaintiff must establish that standard through the testimony of an expert. *Lenkin-N Ltd. P'ship v. Nace*, 568 A.2d 474, 477-478 (D.C. 1990). Specifically, Plaintiff has a burden to present expert testimony at a trial to establish the standard of care when the ultimate issue involves a subject that is "distinctly related to some science, profession or occupation so as to be beyond the ken of the average person." *Griggs v. Washington Metropolitan Area Transit Authority*, 2002 WL 31174533 (D.D.C. 2002) (quoting *Dist. of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987).

Over the last decade the requirement of expert testimony has been applied more broadly to a variety of situations, and therefore a substantially smaller number of cases are falling within the common knowledge exception. *Beard v. Goodyear Tire & Rubber Co., et al.*, 587 A.2d 195 (1991). As evidence of this trend, the District of Columbia Court of Appeals has required plaintiffs to

present expert testimony regarding the standard of care for relatively common situations.[7] *Marshall v. D.C. Caribbean, Inc.*, 2004 WL 3257066 (D.D.C. 2004)

Without an expert, the Plaintiff cannot prove at least two of the essential elements in a negligence action: the relevant standard of care, and the defendant's deviation from these standards. *Beard*, 587 A.2d at 199. The inability to establish a standard of care for an issue beyond the ken of the average person is fatal to a lawsuit. *Id.* at 200. Here, Plaintiff has failed to do so, which is fatal to her case. Case law in the District of Columbia clearly requires expert testimony regarding issues of security and safety, the very same allegations specifically set forth by Plaintiff. *Clark*, 708 A.2d at 6345; *Varner*, 891 A.2d at 269. Without expert testimony, Plaintiff cannot establish negligence. Any evidence of any alleged negligence on this issue must be excluded and Plaintiff's Counts I, II, IV and V must be dismissed.

---

[7] *Lenkin-N Ltd. P'ship*, 568 A.2d at 478 (expert testimony required on reasonableness of length of construction delay); *District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C. 1984) (whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature requiring testimony from experts who can place the evidence in appropriate context for the jury); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990) (whether prison officials acted reasonably to secure the safety of a prisoner not within the realm of the everyday experiences of a lay juror; expert testimony is required to establish the standard of care); *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000) ( "[A]n average lay person is not capable of discerning when a leaning tree may create a dangerous situation requiring an emergency response and whether the likelihood of the tree falling is related to the condition of the tree, the street, or other circumstances."); *Messina v. District of Columbia*, 663 A.2d 535, 540 (D.C. 1995) (expert testimony required to establish standard of care on playground); *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 910 (D.C. 2001) (requiring expert testimony regarding methods of crowd control in church); *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433-34 (D.C. 2000) (plaintiff required to present expert testimony to establish standard of care for operation and maintenance of a municipal water main system); *Clark v. District of Columbia*, 708 A.2d 632, 634-35 (D.C. 1997) (expert testimony necessary to establish standard of care applicable to District officials operating juvenile detention center where a juvenile in custody committed suicide); *District of Columbia v. Hanson*, 666 A.2d 30, 35-36 (D.C. 1995) (in negligence action against the District, brought after a two year old child died in foster care as a result of the foster parent's alleged negligence, plaintiff must present expert testimony to establish standard of care for selection supervision of foster parents); *Varner v. District of Columbia*, 891 A.2d 260 (D.C. 2006) (expert testimony on appropriateness and sufficiency of academic discipline, with respect to university's prior discipline of student murderer, is required); *Brisbin v. Washington Sports & Entertainment Co., Ltd.*, 422 F. Supp.2d 9 (D.D.C. 2006) (spectators failure to proffer an expert opinion to establish standard of care regarding maintenance, supervision and management of facility warranted granting summary judgment to owner and operator on claim for negligent crowd control); *Marshall v. D.C. Caribbean Carnival, Inc.*, 2004 WL 3257066 (D.C. 2004) (expert testimony on standard of care regarding organizing a festival is required); *Beard*, 587 A.2d at 200 (proof of objective standard of care to which retail merchants should be held in processing applications for credit cards

Based upon District of Columbia law, it appears likely that expert testimony is also necessary for Plaintiff to establish the required heightened foreseeability of probable crime.  *See Bailey v. District of Columbia*, 668 A.2d 817, 822 (D.C. 1995); *District of Columbia v. Doe*, 524 A.2d 30 (D.C. 1987).  As *Bailey* and *Doe* seem to indicate, in the absence of direct evidence, heightened foreseeability of crime must be established by circumstantial evidence through expert testimony.   Here, like in *Bailey*, and unlike in *Doe*, Plaintiff has failed to proffer any circumstantial evidence of heightened foreseeability of crime based upon other shooting incidents, assaults, or other gun-related violence at Bannum Place or any other CCC like Bannum Place.   Plaintiff has also failed to allege facts tending to establish a heightened foreseeability based upon first-hand knowledge of any such violence acquired by Bannum Place. Because Plaintiff has failed to proffer direct evidence of same, and has also failed to designate an expert to offer opinion testimony related to heightened foreseeability issues, i.e., other shooting incidents, assaults, or other gun-related violence at Bannum Place, Plaintiff cannot meet her burden with respect to her negligence claims and such claims should be dismissed.

**c.  Plaintiff Cannot Demonstrate Causation Between Alleged Breaches of Duty and the Alleged Shooting by an Armed Intruder.**

Plaintiff offers no allegation, let alone any proof in Answers to Interrogatories, that different actions by this Defendant would likely have prevented the injury.  Plaintiff fails to allege that the supposedly inadequate security measures were the proximate cause of Plaintiff's decedent's injuries.  *See* Complaint at ¶¶ 31, 32 and 33.   As noted above, Bannum Place staff members were forbidden to carry weapons of any type, were forbidden from physically restraining or detaining any resident, and were required to call 911 in response to situations potentially physical in nature, in addition to the fact that there were no bars, locks, gates,

---

requires expert testimony).

surveillance requirements, etc., at Bannum Place. Thus, even if the alleged gunman walked through the front door visibly brandishing a weapon, Bannum Place employees would not have been able to stop the alleged shooting. Their sole recourse would have been to summon assistance from the police by calling 911. Simply put, there would have been no way to stop the incident from occurring, given the limited confines of Bannum's agreement with BOP. Bannum's obligations regarding security measures at Bannum Place were governed by the contract documents with BOP, and BOP did not require (nor pay for) any of the previously mentioned security measures. Bannum had no obligation to enact such measures, as none were imposed by contract. *See* Exhibits C and E. In addition, Plaintiff has failed to establish that any were required by statute or any other law. Therefore, based upon the foregoing, Bannum Place was not the proximate cause of Plaintiff's decedent's injuries and Plaintiff's Complaint must be dismissed.

### E.    Plaintiff Has Failed to Establish Her Claim for Negligent Supervision

In Count IV, Plaintiff seeks to recover for negligent supervision. "Under District of Columbia law, in order to state a claim for negligent supervision, 'it is incumbent upon a party to show that an employer knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'" *Giles v. Shell Oil Corp.,* 487 A.2d 610, 613 (D.C.1985) (no emphasis added).

In this case, Bannum, Inc. had no employees at Bannum Place, since it had two years earlier assigned the contract to another corporation, Bannum Place of Washington D.C., Inc. Moreover, Plaintiff has not alleged with any specificity that Bannum Place employees behaved in a dangerous or incompetent manner. *See* Complaint. Instead, Plaintiff has offered only

conclusory allegations that "Defendant breached their duty of care by failing to monitor and supervise their staff's activities and condoning conduct by its employees that violated the District's written policies . . . ."  *See* Complaint at ¶ 32.  Plaintiff cannot establish that Bannum Place owed a duty to Mr. McKinney, Jr. to provide employee supervision and/or training that would have included heightened levels of security (as set forth above).  It naturally follows that if Bannum Place did not have a duty to provide such security, that there was also no duty to supervise and/or train its employees with regard to these types of security precautions - those that Plaintiff presumes would have prevented the occurrence.

Even if heightened security measures were adopted, based upon the nature of the Bannum Place facility, i.e., no bars, locks, or gates, and the daily in/out movement of residents, no amount of training and/or supervision could, when considered together with the contractual limitations, have prevented the alleged occurrence from taking place; thus, the claim also fails for lack of causation.

### F.     There is not a Valid Claim for Negligent Infliction of Emotional Distress

The claim in Count V for "negligent infliction of emotional distress" is essentially the same flawed negligence claim previously discussed.  For the same reasons as applicable to the negligence claim in Counts I, II, and IV, i.e., improper party, waiver of liability,  lack of duty and no proof of causation, Defendant is entitled to summary judgment on Count V.

### G.     Plaintiff Cannot Use 42 U.S.C. § 1983, or Any Other Federal Law, to Sue Bannum, Inc., a Private Entity, for Damages for Alleged Deprivation of Constitutional Rights

In Count III, Plaintiff attempts to assert a private cause of action for damages under 42 U.S.C. § 1983 for an alleged violation of the Eighth Amendment's right to be free of cruel and unusual punishment.   Plaintiff alleges that "defendant, acting under color of law and with

deliberate indifference to and reckless disregard for the safety and well being of the residents/inmates transferred to Bannum Place . . . allow[ed] to be committed acts which deprived Cleveland McKinney, Jr. of his constitutional rights against cruel and unusual punishment." Complaint at ¶ 27.   Plaintiff's decedent was a <u>federal</u> offender, who was referred to Bannum Place by the <u>federal</u> BOP.  *See* Exhibit M.   Bannum, Inc.'s contract was with the <u>federal</u> BOP, not a state or municipality.  *See* Exhibits C and D.   Thus, 42 U.S.C. § 1983 is inapplicable since it applies only to persons acting under color of *state* law, not federal law.  *See Bivens v Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 398, fn.1 (1971); *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001).  Moreover, there is no private right of action for damages against private entities that engage in alleged constitutional deprivations while acting under color of federal law.  *Malesko, supra.*   As such, Plaintiff cannot sue under Section 1983, nor can she bring a *Bivens*-type private action for damages against a private entity like Bannum, Inc.

In *Bivens*, the Supreme Court held that a private person could invoke the federal question jurisdiction of the federal courts to recover money damages against federal officials who violated the plaintiff's constitutional rights. Then, in *FDIC v. Meyer*, 510 U.S. 471 (1994), the Supreme Court stated that a *Bivens*-type action, which is permissible against individual federal officers, cannot be expanded to allow claims against federal agencies.   Thereafter, in *Malesko*, the Supreme Court answered the question that is relevant here, as to whether a *Bivens*-type action for damages could be brought against a private company acting under color of federal law. Interestingly, *Malesko* dealt with a claim against a private company operating a halfway house for federal offenders pursuant to a contract with BOP, just like what is alleged in this case.  The U.S. Court of Appeals for the Second Circuit concluded that a *Bivens*-type claim would be

allowed against a private company. The Supreme Court, in no uncertain terms, reversed, holding

that neither *Bivens* (nor § 1983) would permit such a private cause of action for damages against

a private company acting under color of federal law. *Malesko, supra*. Rather, the Supreme

Court stated that such matters would be left solely to state law remedies, e.g., negligence claims.

*Id.* Defendant is clearly entitled to summary judgment on Count III.

<div style="margin-left: 40%">

Respectfully submitted,

CARR MALONEY P.C.


By:   /s/ Kevin M. Murphy
      Kevin M. Murphy, D.C. Bar #388476
      Cedric D. Miller, D.C. Bar #464651
      1615 L Street, N.W.
      Suite 500
      Washington, D.C.  20036
      (202) 310-5500 (Telephone)
      (202) 310-5555 (Facsimile)

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTER BEST MITCHELL, | : | |
| Individually and as next best friend of | : | |
| Cleveland McKinney, Jr. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.:  1:06-CV-00491 |
| | : | Judge:  Rosemary M. Collyer |
| BANNUM, INC., | : | |
| | : | |
| Defendant. | : | |

**<u>ORDER</u>**

UPON CONSIDERATION of Defendant Bannum, Inc.'s Motion for Summary Judgment

and/or Motion to Dismiss, and any opposition thereto, it is this _____ day of

_____, 2007, hereby

ORDERED, that Defendant Bannum, Inc.'s Motion is GRANTED; it is further

ORDERED, that summary judgment is hereby entered in favor of defendant on all claims

in this case.

_____
The Honorable Rosemary M. Collyer

Copies to:

Kevin M. Murphy, Esquire
Cedric D. Miller, Esquire
1615 L Street, N.W.
Suite 500
Washington, D.C.  20036

Gregory L. Lattimer, Esquire
1100 H Street, N.W.
Suite 920
Washington, D.C.  20005

Donald M. Temple, Esquire
1229 15th Street, N.W.
Washington, D.C.  20005