UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTER BEST MITCHELL,<br>Individually and as next best friend of<br>Cleveland McKinney, Jr.<br><br>Plaintiff,<br><br>v.<br><br>BANNUM, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: Case No.: 1:06-CV-00491<br>: Judge: Rosemary M. Collyer<br>:<br>:<br>:<br>: |

**DEFENDANT BANNUM, INC.'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE**

Defendant, Bannum, Inc. ("Bannum" or "Defendant"), by and through counsel, CARR MALONEY P.C., respectfully submits this Statement of Material Facts Not in Dispute.

1. Bannum, Inc. ("Bannum") is a private company that contracted with the United States Department of Justice, Federal Bureau of Prisons ("BOP") to operate a Community Corrections Center ("CCC"), sometimes referred to as a "half-way house", in Washington, D.C. *See* Exhibits C and E.

2. Exhibits C, D and E comprise the full contract between Bannum and BOP (the "Contract"). *See* Affidavit of David A. Lowry, Bannum, Inc., attached hereto as Exhibit I.

3. Only the Community Corrections Manager ("CCM") could approve a federal offender's placement at a CCC. *See* Exhibit E at 1.

4. The Statement of Work ("SOW") sets forth the contract performance requirements for the management and operation of the CCC for federal offenders. *See* Exhibit E at 1.

5. On May 3, 2003, Bannum, Inc. assigned the entire contract to operate the CCC in Washington, D.C. to a separate entity, Bannum Place of Washington, D.C., Inc. *See* Exhibit A. Thereafter, Bannum Place of Washington, D.C., Inc., and not Bannum, Inc., was the entity that operated the contract. *See* Exhibit I.

6. Bannum Place of Washington, D.C., Inc., is an entity duly incorporated in Washington, D.C. in May 7, 2003. *See* Exhibit K.

7. While at Bannum Place (the CCC or half-way house), offenders must participate in maintaining family and community ties, through correspondence, visitation and planning for eventual release through participation in pre-release classes and other programs. *See* Exhibit E at 3.

8. Offenders have the obligation to honor their debts and begin payment while housed at the CCC. *See* Exhibit E at 3.

9. Bannum Place was required to report all criminal activity related to the performance of the contract to the appropriate law enforcement investigative agency, e.g., Federal Bureau of Investigation, United States Marshals Service, state and local authorities, and immediately notify the CCM of the report. *See* Exhibit E at 4.

10. Bannum Place employees were prohibited from possessing lethal weapons or weapons which could inflict personal injury, to include pepper spray or other self-defense type of chemical agents, in the facility and while on duty. *See* Exhibit E at 21.

11. Bannum Place was required to implement "accountability" systems that were intended to facilitate the process of locating offenders who were allowed to come and go from the facility. *See* Exhibit E at 47.

12. Bannum Place provided housing and related services to those offenders referred by BOP who were from Washington, D.C. and the immediate surrounding area and were entering the process of returning to their homes, family and friends. *See* Exhibit F at 2.

13. Bannum Place's residents went to work daily and returned to the facility after work to sleep, except for those on approved leave or home confinement. *See* Exhibit F at 2.

14. As long as offenders honored their agreement to qualify for the program, they could visit their family and friends if they so chose. *See* Exhibit F at 2.

15. Offenders would return to the facility on weekday evenings at their individual curfew time except for those on approved leave or home confinement. *See* Exhibit F at 2.

16. Many residents would be allowed to check out of the Bannum Place facility on Friday and would not return again until their Sunday night curfew. *See* Exhibit F at 2.

17. Bannum Place monitored each resident's movement in the community by periodic on-site and telephone verification of their employment, educational pursuits, family visits, or other whereabouts. *See* Exhibit F at 2.

18. Bannum Place assisted the residents in finding employment if they were not employed by making referrals to local employment agencies and local employers who had expressed interest in employing its residents. *See* Exhibit F at 2.

19. Since their time at Bannum Place was a period of transition for offenders, Bannum Place simply assisted them in re-establishing employment and family ties, locating suitable housing and preparing to function normally within the community to which they were returning. *See* Exhibit F at 2.

20. Bannum Place also made referrals to local community agencies as appropriate. *See* Exhibit F at 2.

21. Bannum Place's personnel monitored the program on a 24 hour basis, but there were no locks, bars, or other physical restraints, and none were required. *See* Exhibit F.

22. Bannum Place employed a professional staff to include social workers to monitor and guide the residents through this period of transition. *See* Exhibit F at 3.

23. If a resident violated his agreement to remain in the program by missing curfew, by unexcused absence from work, etc., or if the resident failed to return to the facility or decided to leave the facility without permission, Bannum Place employees could not and would not stop them. In these cases, Bannum Place employees would simply report the resident to the appropriate Federal authorities. *See* Exhibit F at 3.

24. Penalties included a return to incarceration. *See* Exhibit F at 31.

25. Bannum's staff-members were not peace officers, were not permitted to carry weapons of any kind, and were not authorized to physically restrain any person. *See* Exhibit F at 3.

26. Bannum's staff did not wear uniforms or possess any other form of identification or powers than any other citizen of Washington, D.C. *See* Exhibit F at 3.

27. Bannum was required to do pat-downs of offenders and searches of their belongings, only once per month, for control and disposition of contraband. *See* Exhibit E at 50.

28. The program at Bannum Place is voluntary and inmates are not required to release through the program. *See* Exhibit I.

29. Community confinement does not constitute imprisonment. *See* Exhibit E at 1.

30. Cleveland McKinney, Jr. was a federal offender, who was referred to Bannum Place by the federal BOP. *See* Exhibit M.

31. Cleveland McKinney, Jr. signed a Hold Harmless Agreement upon entering the CCC program at Bannum Place. *See* Exhibit L.

32. The CCC program at Bannum Place is voluntary and prison inmates are not required to release through the CCC program. In fact, some inmates choose not to participate in the CCC program. As such, Cleveland McKinney had the option of refusing the transfer to Bannum Place and completing his sentence elsewhere. See Exhibit L, ¶ 11.

                            Respectfully submitted,

                            CARR MALONEY P.C.

By:      /s/ Kevin M. Murphy
         Kevin M. Murphy, D.C. Bar #388476
         Cedric D. Miller, D.C. Bar #464651
         1615 L Street, N.W.
         Suite 500
         Washington, D.C. 20036
         (202) 310-5500 (Telephone)
         (202) 310-5555 (Facsimile)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing **Defendant Bannum, Inc.'s Statement of Material Facts Not in Dispute** was filed and served, electronically, on this 5th day of April, 2007, to:

         Gregory L. Lattimer, Esquire
         1100 H Street, N.W.
         Suite 920
         Washington, D.C. 20005

         Donald M. Temple, Esquire
         1229 15th Street, N.W.
         Washington, D.C. 20005

         /s/ Kevin M. Murphy
         Kevin M. Murphy