**EXPERT REPORT**

**TO:**       Kevin M. Murphy, Esquire

**FROM:**  David A. Lowry

**DATE:**   May 30, 2007

**RE:**       Report of Opinions re: Ester Best Mitchell Claim, Cleveland McKinney, Jr., Shooting, 6/29/2005

## I.   SUMMARY OF BASIC FACTS

The following is a basic outline of facts and claims related to the 6/29/2005 shooting of Cleveland McKinney, Jr., the injury sustained by Mr. McKinney, Jr., and the standard industry practices related to accountability, safety and security measures, life safety codes and applicable building code requirements, employee supervision and training, adequacy of staffing, control of contraband, and, the lack of any significant prior history of prior violent crime at Bannum Place of Washington, D.C. This is a combination of facts found in the documents and what has been represented to me by the attorneys regarding other facts not set forth directly in the documents. If the facts turn out to be significantly different, that may or may not affect my opinions, which are outlined in section II below.

Pursuant to an Award/contract dated November 21, 2001, Bannum, Inc. contracted with the United States Department of Justice, Federal Bureau of Prisons ("BOP") to operate a Community Corrections Center ("CCC"), (or sometimes referred to as a "half-way house"), in the District of Columbia. This CCC, was named Bannum Place of Washington, D.C. The Award/contract, by its terms, includes the Requests for Proposals, the Proposals, amendments, modifications and supplementation thereto, and the Statement of Work ("SOW"). These documents, taken together, comprise the contract between Bannum, Inc. and BOP to operate Bannum Place in Washington, D.C.

On June 29, 2005, Mr. Cleveland McKinney, Jr. ("Mr. McKinney, Jr."), an inmate housed at Bannum Place was allegedly shot and killed while in the facility. According to Plaintiff's Complaint, this killing was perpetrated by an unknown gunman who was able to gain access to the facility. It is alleged by Plaintiff that this killing could have been prevented had Bannum Place, *inter alia*, taken measures to adequately secure the facility and properly train and supervise its employees.

## II.   OPINIONS

1.   Based upon the standard industry practices of CCC operators with regard to accountability and safety and security measures, pursuant to BOP Requests for Proposals,

Modifications, Amendments, Awards of contract, and Statements of Work ("Contract Documents"), Bannum, Inc. did not breach any standard of care.

2. Based upon standard industry practices of CCC operators, Bannum, Inc. did not breach any standards of care with regard to the life safety codes and applicable building code requirements as such codes relate to the safety and security of residents.

3. Based upon standard industry practices of CCC operators, Bannum, Inc. did not breach any standards of care with regard to the provision of training and supervision of its employees.

4. Based upon standard industry practices of CCC operators, Bannum, Inc. did not breach any standards of care regarding the adequacy of its staffing.

5. Based upon standard industry practices regarding measures taken to control contraband, Bannum, Inc. did not breach any standards of care.

6. Based upon standard industry practices regarding measures taken to control the entry and exit of residents and visitors of CCCs, Bannum, Inc. did not violate any standards of care.

7. Based upon standard industry practices regarding measures taken to control inmate accountability, Bannum, Inc. did not violate any standards of care.

8. Based upon the lack of any significant prior history of violent crime at Bannum Place, Bannum, Inc. did not violate any standards of care with regards to security measures.

### III. MATERIALS AND INFORMATION REVIEWED

The materials and information that I have reviewed include the following, in addition to my own experience, industry knowledge, information from my work as Executive Director of Bannum, Dismas House and numerous other CCC's, and information provided by counsel:

1. Complaint filed by Ester Mitchell
2. Plaintiff's Answers to Interrogatories
3. The Contract Documents (as that term is defined in Bannum, Inc.'s Motion for Summary Judgment
4. Bannum, Inc.'s Motion for Summary Judgment and Statement of Material Facts
5. Other miscellaneous documents.

## IV.    RESUME, FEE FOR SERVICES, AND PRIOR TESTIMONY

A summary of my professional experience that is relevant to this case and my opinions are as follows:

I have several decades of experience operating or managing CCCs. My *curriculum vitae* is enclosed. My expertise includes, without limitation, serving as executive director of numerous Community Corrections Centers ("CCC") from 1979 through 2006. I have qualified as an expert in administrative proceedings before the Board of Zoning Adjustment in Washington, DC. Additionally, many years ago, I was qualified as an expert by the United States Department of Justice. Moreover, I was a Compliance Auditor for the American Correctional Associations Commission on Accreditation for Corrections in the early 1980's.

The fee that I charge for my services in providing expert witness opinions is $225 per hour.

Within the past twenty seven years, I have provided expert testimony in a deposition or in court, in the following matters:

| Parties Involved | Court | Attorneys | Type of Case |
|---|---|---|---|
| ANC 5B/DC, DCRA | BZA | D. Temple/M. Gordon | Zoning & Use |
| | | | |
| | | | |

By: /s/ David A. Lowry
David A. Lowry
Consultant
2701 Gulf Blvd.
Belleair Beach, FL  33786